**UNITED STATES v. McMENAMIN et al.**
No. 12610.

District Court, E. D. Pennsylvania.
Dec. 29, 1944.

Gerald A. Gleeson, U. S. Atty., and Edward A. Kelly, Sp. Asst. to U. S. Atty., both of Philadelphia, Pa., and Golden N. Dagger, Sp. Asst. to Atty. Gen., for plaintiff.

Robert G. Kelly and Louis F. McCabe, both of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

This indictment is drawn under section 6 of the War Labor Disputes Act, popularly known as the Smith-Connally Anti-Strike Act, 50 U.S.C.A.Appendix § 1506. It recites that the transportation systems of the Philadelphia Transportation Company were facilities in the possession of the United States, having been seized by order of the Secretary of War on August 3, 1944, pursuant to authority of Executive Order of the President, Aug. 3, 1944, No. 9459, and charges violation of the Act in (1) instigating, etc., the employees of the said facilities to strike and (2) aiding the strike.

The pertinent provision of the section is as follows: "Whenever any plant, mine, or facility is in the possession of the United States, it shall be unlawful for any person (1) * * * to interfere, by lock-out, strike, slow-down, or other interruption, with the operation of such plant, mine, or facility, or (2) to aid any such lock-out, strike, slow-down, or other interruption * * *."

The first two sections of the Act consist of its title and certain definitions, immaterial here. Section 3 empowers the President to take possession of "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials which may be required for the war effort or which may be useful in connection therewith." Sections 4 and 5 have to do with terms and conditions of employment in such plants, etc.

There is no doubt whatever that all of the provisions of sections 3, 4 and 5, 50 U.S.C.A.Appendix §§ 1503-1505, apply only to the limited class of plants, mines and facilities described in section 3, namely, those equipped for the manufacture, production, etc., of war materials. Broad as this class is, it does not embrace the transportation systems of the Philadelphia Transportation Company. By no permissible interpretation is transportation, even of war workers, manufacture or production.

The defendants contend that the words "any plant, mine, or facility" of section 6 must be taken to refer only to the limited class dealt with in the earlier sections of the Act. If their argument is sound, the indictment fails to charge an offense, because it does not (and could not) allege that the systems of the Philadelphia Transportation Company belong in that class.

If section 6 had been enacted separately, as a statute complete in itself, the question could not have arisen. Its language is plain enough. The transportation systems of the Philadelphia Transportation Company unquestionably constitute a "facility"

and "any" is normally a word of all-inclusive meaning. The question, therefore, is whether Congress, in section 6, meant something less than what it plainly said.

An examination of the Act discloses that, although the words "plant, mine, or facility" appear some 13 times in sections 3, 4, and 5, section 6 is the first (though not the only) place in which they are used without being qualified by the word "such" or by some equivalent descriptive phrase (e.g. "taken under authority of section 9 of the Selective Training and Service Act of 1940, as amended", 50 U.S.C.A.Appendix § 309) by which their meaning is clearly restricted to the limited class of the three preceding sections. Is the absence of the word "such" in section 6 merely the result of careless drafting?

The defendants invoke certain general rules for the interpretation of statutes, namely, the rule that penal statutes are to be strictly construed, the rule that any one section of an act must be considered in connection with the entire statute of which it is a part, and the rule that the general meaning of the words will often be restricted to apply only to persons or things belonging to the class specified in an earlier part of the statute.

All these rules are well established, but they have no application where the words of the statute are so plain as to require no judicial interpretation and, in doubtful cases, they will not be applied counter to the evident intent of the legislature. The rule calling for strict interpretation of penal statutes means no more than that the terms used must not be given a broader meaning than is clearly warranted. In penal statutes no less than in others, the language, if clear, is conclusive. The other rules are at best artificial aids to be resorted to where there is reason to think that the legislature, through an ill considered choice of words, failed to express its real intention. They do not mean that the Court must go outside one section or clause, the meaning of which is plain, to search for other provisions of the statute which might make it ambiguous or doubtful.

In this case the use of "any" without restrictive words cannot be attributed to want of awareness on the part of Congress, when it enacted section 6, of the effect of the langauge it was choosing. That section was certainly the most important one of the Act. Its adoption was regarded as a momentous step in control of wartime industrial relations. Its legislative history shows that it was highly controversial and that it gave far more concern to the members of the Congress which passed it than any of the other sections.

Except for the suggestion that it is improbable that Congress would, in a statute the earlier sections of which dealt only with plants, etc., manufacturing war materials, have intended in the penal section to apply the penalties to all plants, etc., without regard to their actual connection with manufacturing or production, the defendants offer no good reason why Congress should have intended to give the word "any" a more restricted scope than its ordinary meaning implies. There should be something more than that to require the Court to disregard the normal meaning of the word. The argument breaks down when the entire Act, including the succeeding sections, is considered. Reading on from section 6, we find that sections 7 and 8 dealing, respectively, with the powers of and procedure before the National War Labor Board and with the 30 days notice and secret ballot required in case of proposed strikes, both expressly exclude from their operation not only plants producing war materials but all plants, etc., of which possession has been taken by the United States, and that section 9 is concerned with political contributions for labor organizations without reference to any specified industry at all. Clearly, the Act as a whole is not unitary in its structure nor does it appear that disturbances in the manufacturing and producing plants, etc., described in the first three sections are its only objective. On the contrary, it is broad in scope, striking out in several directions, to regulate in different ways the relations of labor, industry and government under war emergency conditions.

Even if sections 7, 8 and 9 were not in the Act, a consideration, limited to the first six sections, of the general object of that part of the statute, not only would furnish no support for the defendants' contention but would lead to the conclusion that in enacting section 6 Congress meant what it said. The major purpose of that part of the Act is plain. Congress was determined that the successful prosecution of the war should not be impeded by strikes interfer-

ing with the war effort on the home front. In order that ample warning should be given to all concerned and that the rights of labor should not be unduly curtailed, the penal provision was made effective only after the President had recognized and declared the extent and gravity of the national interests involved, by taking possession of the industry. True, as the defendants argue, an interpretation sustaining this indictment will make the penal provision applicable to some government-possessed businesses or industries which may bear little or no relation to the war effort. As a practical matter, however, that class is negligible. There is a far larger class of operations and services (of which transportation and communication are examples), quite as necessary as the production of war materials, which would be entirely excluded by the alternative view. It cannot be supposed that, in spite of having adopted an all-inclusive term, Congress should have intended to exclude such services from the scope of the anti-strike section.

The decisions cited by the defendants are mainly applications of the familiar rule that a penal statute may not be broadened to include otherwise lawful acts not within the plain language. Here the question concerns the converse of the rule. It is whether to narrow such a statute so as to exclude a situation unmistakably within the literal meaning of its terms. Courts are not free to do that where literal meaning is entirely consonant with the purpose of the law.

I hold, therefore, that the indictment properly charges an offense under section 6 of the War Labor Disputes Act.

As to the legality of the possession of the United States of the facilities in question, assuming that the defendants have the right to raise that question on demurrer or motion to quash, no more need be said than that the President was specifically authorized by the Act of August 29, 1916, 10 U.S.C.A. § 1361, to take possession of "any system or systems of transportation" and this Act was referred to in the Executive Order as authority for the seizure. Thus, the possession of the United States of the Philadelphia Transportation Company System was lawful.

The motion to quash and the demurrer are both overruled.